UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
Orlando Division

METAGENICS, INC.,
a California corporation,

       Plaintiff,

                                  Case No.: 6:04-cv-1555-OM-19-JGG

vs.

ATLANTIC PRO-NUTRIENTS,
INC., an Illinois Corporation, and
BRIAN J. BLACKBURN,
Individually,

       Defendants.

_____/

## VERIFIED COMPLAINT FOR DAMAGES AND
## INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff METAGENICS, INC., a California corporation ("Metagenics" or "Plaintiff"), by its attorneys, McDermott Will & Emery LLP, hereby sues Defendants Atlantic Pro-Nutrients, Inc. ("APN") and Brian J. Blackburn ("Blackburn"), individually, (collectively referred to as "Defendants"), and alleges as follows:

### Nature and Basis of Action

1.    This is an action for trademark infringement and use of a false designation of origin in violation of Sections 32(1) and 43(a) of the Trademark Act of 1946, 15 U.S.C. §§ 1114(1) and 1125(a); for common law trademark infringement; for common law unfair competition; for common law unjust enrichment; for common law misappropriation and conversion; for common law tortious interference with existing business relationships; for violation of Florida Statutes § 501.201 *et seq.*, commonly

known as the Florida Deceptive and Unfair Trade Practices Act; for violation of Florida Statutes § 495.011 *et seq.*, and for False Advertising. Plaintiff seeks equitable relief and monetary damages.

### Parties

2.      Plaintiff Metagenics, Inc. is a corporation duly organized and existing under the laws of the State of California, having its principal place of business at 100 Ave La Pata, San Clemente, California. Metagenics is the premier formulator, manufacturer and seller of premium-quality dietary and nutritional supplements to health care professionals throughout the United States and the world.

3.      Defendant Atlantic Pro-Nutrients, Inc. is a corporation organized and existing under the laws of the State of Illinois, having its principal place of business and headquarters at 725 S. Kirkman Rd., Orlando, Florida 32811. APN is currently engaged in the marketing, promotion and sale of nutritional supplement products sold under the brand name Xymogen.

4.      Defendant Brian J. Blackburn is a citizen and resident of the State of Florida, and upon information and belief, Blackburn resides in Orlando, Florida. Upon information and belief, Blackburn is the president of APN, the sole director and officer of APN, and Blackburn is in primary control of all of the business operations and activities of APN.

5.      Upon information and belief, Blackburn exerts complete domination and/or control over APN as the controlling shareholder, which control and domination

renders the corporation a mere business conduit or alter ego used for Blackburn's personal benefit and financial gain.

6.     Upon information and belief, Blackburn is using APN for an improper and unjust purpose to the detriment of Metagenics.

## Jurisdiction and Venue

7.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1337 and 1338, because this action arises under the Trademark Act of 1946, codified at 15 U.S.C. § 1051 *et seq*. (the "Trademark Act"), as hereinafter more fully demonstrated. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §§ 1338 and 1367, because those claims are joined with substantial and related claims under the Trademark Act.

8.     This Court also has jurisdiction over this dispute based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. This is an action for damages and equitable relief in which the amount in controversy, exclusive of costs, interest and attorneys' fees, exceeds $75,000.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

10.     Defendants are subject to personal jurisdiction in this Court because, among other things, Blackburn and APN are engaged in substantial and not isolated activity within Florida, and are operating, conducting, engaging in, and carrying on a business in Florida and have their main office and headquarters in Florida.

11.     This action arises out of the transaction of business, commission of tortious injury and other activities by Defendants within Florida, this District and

elsewhere.  Defendants have committed within this District the unlawful acts complained of herein.

## FACTS GIVING RISE TO THIS ACTION

### Plaintiff's Business and The METAGENICS® Trademark

12.     Founded in 1983, Metagenics is the premier formulator, manufacturer and seller of premium-quality nutritional products sold to healthcare practitioners throughout the United States and worldwide.  Metagenics is the leading provider of premium quality nutritional products to health professionals worldwide.

13.     With a talent base of close to 400 employees worldwide, including a team of nearly 40 highly trained scientists and clinicians, Metagenics is an industry leader in the nutraceutical industry, and has a long established reputation for excellence in the industry.

14.     Metagenics holds multiple proprietary formula patents and produces over 400 all-natural, research-based products to optimize health.  For example, Metagenics manufactures, promotes and sells a wide range of nutritional products including medical foods, dietary supplements, and functional foods.

15.     Metagenics focuses its business on providing high quality, effective, safe and consistent nutritional and dietary supplement products.  Metagenics is GMP (Good Manufacturing Practices) certified by various associations and industry groups such as the National Nutritional Foods Association, NSF International, and the Therapeutic Goods Administration of Australia.

16. Metagenics is firmly committed to using qualified ingredients, provided in the right form, at the right dosage and verified by quality control testing. This is among the reasons that Metagenics' products work so well and are recommended by health professionals worldwide.

17. Since the inception of the business in 1983, Metagenics has continuously promoted, advertised, offered and sold its nutritional products under the brand name METAGENICS®.

18. Since 1983 Metagenics has used its distinctive marks METAGENICS® and "METAGENICS GENETIC POTENTIAL THROUGH NUTRITION®" in connection with the nutritional products business (hereinafter collectively referred to as the "METAGENICS® Mark"). The METAGENICS® Mark has been prominently utilized in connection with every aspect of the marketing, advertising, promotion and sale of Plaintiff's nutritional products and Plaintiff's business, including product packaging, marketing brochures, websites, letterhead, business cards, print advertising, and telephone directories.

19. Metagenics has continuously used the METAGENICS® Mark in such marketing, promotion and advertising, as well as in its business transactions, throughout the United States and the world.

20. Since 1983, Plaintiff has spent in excess of Forty million dollars advertising and promoting its nutritional supplement products in connection with the METAGENICS® Mark.

21.    Over the years Plaintiff has sold millions of dollars of its nutritional products under the METAGENICS® Mark.

22.    As a result of the extensive sales and marketing efforts described above by Metagenics, the METAGENICS® Mark for the nutritional products industry has come to be recognized by consumers and health care professionals as identifying the high quality and consistency of Plaintiff's nutritional products and business.

23.    Thousands of health professionals have come to trust the METAGENICS® name and rely upon the quality, safety and effectiveness of products bearing the METAGENICS® Mark.

24.    Metagenics maintains its leading position in the professional nutrition marketplace by putting the patient's interests first, responding quickly to any customer's or health care professional's needs, and never compromising on safety and effectiveness of the METAGENICS® products.

25.    On January 19, 1993, the United States Patent and Trademark Office (the "PTO") issued U.S. Trademark Registration No. 1,746,757 to Plaintiff for the METAGENICS® trademark in connection with the nutritional products business. PTO confirmation of U.S. Reg. No. 1,746,757 is attached hereto as Exhibit A.

26.    Additionally, on April 17, 1998, the PTO also issued U.S. Trademark Registration No. 2,148,578 to Plaintiff for the phrase "METAGENICS GENETIC POTENTIAL THROUGH NUTRITION®" for use in the nutritional supplements industry. PTO confirmation of U.S. Reg. No. 2,148,578 is attached hereto as Exhibit B.

27.     Plaintiff's federal trademark registrations are valid and subsisting in law, were duly and legally issued, and are prima facie evidence of the validity of the mark registered, and constitute constructive notice of the ownership of the mark by Plaintiff in accordance with Sections 7(b) and 22 of the Trademark Act of 1946, 15 U.S.C. §§ 1057(b) and 1072.

28.     Since 1983, Metagenics has used the METAGENICS® Mark continuously in marketing and promotional materials for nutritional products in interstate commerce. As a result, the METAGENICS® Mark has become, through widespread and favorable public acceptance and recognition, an asset of substantial value to Metagenics as a symbol of goodwill and origin.  By virtue of its adoption and long continuous use of the METAGENICS® Mark in connection with the nutritional products industry, Plaintiff is the owner of all right, title and interest in and to the METAGENICS® Mark in connection with the nutritional products industry.

## Quality Control Measures and The Authorized
## Distribution Network For METAGENICS® Products

29.     The high quality, consistency, safety and effectiveness of the nutritional products are essential to ensuring that the METAGENICS® brand of nutritional products are accepted and appreciated by healthcare practitioners, patients and consumers.

30.     Metagenics takes substantial quality control measures and imposes exacting standards to ensure that the nutritional products bearing the METAGENICS® Mark are of the highest quality, consistency, safety and stability.  These quality control

measures include a comprehensive product stability program implemented by Metagenics.

31.    Metagenics operates within a "Lot Controlled System" which is intended to provide Metagenics with the ability to know, track and document the location of every finished METAGENICS® product in the event of a market recall or other product quality issue.

32.    Many METAGENICS® nutritional products contain ingredients that are perishable, and Metagenics utilizes and enforces an expiration dating system to ensure that the METAGENICS® products will meet certain established specifications throughout the shelf-life.

33.    Metagenics engages in shelf-life testing of the METAGENICS® products to monitor the expiration dating system.

34.    To help ensure the quality, safety, effectiveness and consistency of the nutritional products sold bearing the METAGENICS® Mark, Metagenics sells these products through a specific select group and network of authorized distributors. These designated authorized distributors then sell the METAGENICS® products directly to various health care professionals.

35.    Because of this authorized distribution network, Metagenics can better monitor and control the quality, safety, stability and consistency of the METAGENICS® products being sold to consumers.

36. The use of the select network of authorized distributors further enables Metagenics to ensure that the health care professionals and consumers receive the highest level of customer service and support provided by Metagenics, and that any customer problems or questions are promptly, efficiently and adequately addressed. The authorized distributors are directly accountable to Metagenics.

37. As part of the distribution arrangement, the authorized distributors have agreed with Plaintiff to only sell the METAGENICS® products to specified customers, and not to sell such products to competing nutritional products companies.

## DEFENDANTS' WRONGFUL CONDUCT AND UNFAIR COMPETITION

### Defendants' Prior Relationship With Plaintiff And Defendants' Development of the "Xymogen" Brand For Nutritional Products

38. During years past, Defendant Blackburn through his alter-ego corporation APN engaged in business with Metagenics as an authorized distributor of the METAGENICS® products in the region of the Southeastern United States.

39. Upon information and belief, in or about 2002 or 2003, during a period of time when Defendants were still serving as an authorized distributor of the METAGENICS® products, Defendants began covertly developing a new brand of nutritional supplement products intended to compete directly with the well established METAGENICS® nutritional products.

40. Upon information and belief, Defendants were utilizing proprietary and other information gained from serving as an authorized METAGENICS® distributor to aggressively develop their own new line nutritional products to be sold under the brand

name Xymogen and to compete directly with the well known and well established METAGENICS® brand of products.

41.    As further alleged below, Defendants were seeking to improperly take advantage of their position as an authorized METAGENICS® distributor, and Defendants engaged in a scheme of unfair competition methods and trademark infringement activities in an attempt to improperly usurp and misappropriate a portion of the customer base Metagenics built over more than twenty years.

### Termination of the Distribution Arrangement Between Metagenics and Defendants and Defendants' Initial Infringing Activities and Acts of Unfair Competition

42.    For a variety of reasons, Metagenics and Defendants formally terminated the parties' authorized distribution relationship with an effective termination date of October 8, 2003.

43.    Pursuant to the terms of the termination, as of October 8, 2003, Defendants were no longer authorized distributors of Plaintiff's METAGENICS® products, and Defendants specifically agreed to cease distributing all METAGENICS® products once any remaining inventory was depleted.

44.    In or about September 2003 (prior to the effective termination date of the distribution arrangement), Metagenics discovered that Defendants were improperly using the METAGENICS® Mark in connection with advertising, promotional and marketing materials for Defendants' new, competing and unknown Xymogen nutritional products.

45.    Among the improper uses, Defendants improperly misidentified its company and brand as **"Metagenics-Xymogen"** on a variety of marketing, advertising

and sales materials in an intentional effort to confuse and mislead consumers as to the existence of an affiliation between the highly recognized and well respected METAGENICS® brand and Defendants' new competing brand Xymogen.   See Defendants' Marketing Materials, attached hereto as Exhibit C.

46.   As a further part of the effort to confuse and mislead consumers and to misappropriate the goodwill associated with the METAGENICS® Mark, Defendants also improperly referred to its new competing Xymogen brand as **"Xymogen, a Division of Metagenics APN"** on various marketing, promotional, advertising and sales materials. Id. Defendant did this to confuse and mislead consumers as to an affiliation between METAGENICS® and Defendants' new competing brand Xymogen.

47.   Defendants also improperly used Plaintiff's copyrighted materials, including educational and promotional product literature (such as Formula Focus sheets) in an effort to mislead consumers and to sell its new competing Xymogen products. Id.

48.   Upon learning of these infringing and improper activities, on September 8, 2003, Metagenics sent written notification advising Defendants that they were improperly using the METAGENICS® Mark in several different ways, and informing the Defendants about Metagenics' federally registered trademark and other intellectual property rights.  Metagenics further demanded that Defendants immediately cease and desist such improper and infringing activities.  See Letter dated September 8, 2003, attached hereto as Exhibit D.

49.     Defendants wrongful and infringing activities continued, and in a further effort to stop these infringing activities, counsel for Metagenics sent Defendants a letter dated September 26, 2003, further notifying Defendants about Plaintiff's federally registered trademarks in connection with the METAGENICS® Marks, and demanding that Defendants immediately cease and desist the improper uses of the METAGENICS® Marks. See Letter dated September 26, 2003, attached hereto as Exhibit E.

### Defendants' Continued Pattern of Infringing Activities and Acts of Unfair Competition

50.     Despite these previous notifications and warnings, and well after the formal termination of the parties' distribution relationship, Defendants continued the pattern of improper and infringing activities in an effort to mislead consumers and to misappropriate the goodwill associated with the METAGENICS® Mark.  See e.g., Defendants' promotional and advertising materials, attached hereto as Exhibit F.

51.     Additionally, in or about March 2004, Metagenics discovered that in connection with promotional materials for the Xymogen product line, Defendants were using a bold, overly large, unduly emphasized and misleading reference to "METAGENICS®" to falsely imply an association or affiliation between newly created and unknown Xymogen product line and the well respected METAGENICS® brand. See Exhibit G, attached hereto.

52.     Despite the prior notice, Defendants also improperly utilized the METAGENICS® Mark in connection with product comparison charts that contained false, misleading and inaccurate information concerning the price of METAGENICS®

products. The statements about the METAGENICS® products contained in Defendants advertising materials were false, inaccurate and likely to mislead consumers. Id.

53.     After learning of this continued infringing conduct and unfair competition, Metagenics once again demanded that Defendants respect their intellectual property rights and cease and desist all improper and infringing activities. See Letter dated March 24, 2004, attached hereto as Exhibit H.

54.     Long after Defendants' distributorship arrangement with Metagenics was effectively terminated, and long after any affiliation between Metagenics and Defendants had ceased to exist, Defendants continued to intentionally use a recorded phone message falsely indicating that Defendants were still affiliated with Metagenics and falsely insinuating that Defendants were an authorized distributor of the METAGENICS® products.

55.     Defendants and Defendants' representatives have intentionally made multiple material misrepresentations concerning the source of the products sold under the Xymogen name and the actual relationship between Metagenics and Defendants.

56.     Despite the formal termination of the METAGENICS® distributorship arrangement and despite Defendants agreement to no longer sell METAGENICS® products, Defendants have now improperly induced certain authorized distributors of the METAGENICS® products to breach their distributorship agreements, and to sell certain METAGENICS® products to Defendants in violation of the terms of their distributorships.

57. After improperly obtaining these products bearing the METAGENICS® Mark, Defendants are attempting to re-sell "materially different," lower quality and not genuine products bearing the METAGENICS® Mark to consumers.

58. In attempting to improperly re-sell the METAGENICS® products, Defendants do not follow the strict quality control standards that Metagenics requires for its authorized distributors, including, but not limited to, proper storage requirements, shelf life limitations and other quality control requirements. Additionally, Defendants are not providing the same high level of customer service that Metagenics provides in connection with its nutritional supplement products bearing the METAGENICS® Mark.

59. Defendants are improperly obtaining and re-selling the METAGENICS® products in effort to cause the public to believe that Defendants are still a part of Metagenics' authorized sales network, and Defendants are falsely suggesting a continued affiliation with Metagenics in a manner which is likely to cause confusion as to the source or sponsorship of the METAGENICS® products.

60. Defendants are attempting to re-sell METAGENICS® products in order to improperly imply an association between the new Xymogen product line and long standing and well respected METAGENICS® product line.

61. Upon information and belief, Defendants are also improperly using a "bait and switch" tactic whereby Defendants attempt to lure customers by holding themselves out as a distributor of METAGENICS® products, and then intentionally

steering the customers away from the METAGENICS® products and towards Defendants' competing Xymogen products.

62.     Defendants and Defendants' sales representatives are engaging in various other improper and unfair competitive practices in an effort to improperly solicit and tortiously interfere with METAGENICS® long time customers.

63.     Defendants' improper use of the METAGENICS® Mark is likely to cause confusion, mistake or deception as to the source or origin of its nutritional products in relation to nutritional products of Plaintiff used in connection with the METAGENICS® Mark.

64.     Upon information and belief, despite the fact that Defendants are not GMP (Good Manufacturing Practices) certified by the National Nutritional Foods Association, Defendants' promotional, advertising and marketing materials are falsely asserting that Defendants' Xymogen products are "GMP Certified" in an effort to mislead consumers. See Exhibit I, attached hereto.

65.     Metagenics has been substantially damaged and continues to be damaged by Defendants' wrongful activities described herein.

66.     Multiple instances of actual confusion have already occurred amongst customers and health care professionals who mistakenly believed that Defendants and Defendants' Xymogen products are affiliated with or sponsored by Metagenics.

67.     Defendants have been made aware of these incidents of confusion and have been asked to cease and desist from the infringing misconduct, but as of the date of this filing, Defendants have not stopped the infringing activities. Furthermore, as of

October of 2004, Defendants' indicated to Metagenics executives that they intend to continue to improperly sell Metagenics products in the future.

## COUNT I
## FEDERAL TRADEMARK INFRINGEMENT

68.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

69.     The above described conduct of Defendants in offering for sale and selling in interstate commerce unauthorized items and products bearing the METAGENICS® Mark and colorable imitations thereof is likely to cause confusion, or cause mistake, or to deceive.   Such unauthorized use infringes upon Plaintiff's exclusive rights in the METAGENICS® Mark and is a violation of the Trademark Act of 1946, 15 U.S.C. §§ 1051-1127, and more particularly, Section 32(1) of the Act, 15 U.S.C. § 1114(1).

70.     Defendants' use in commerce of Plaintiff's unique, distinctive and federally registered METAGENICS® Mark in connection with Defendants' new competing Xymogen nutritional product line is likely to cause the public to believe that Defendants' products originate with or are sponsored by Plaintiff or are offered under Plaintiff's supervision or control.

71.     As a result of the widespread public acceptance of Plaintiff's METAGENICS® Mark in connection with the nutritional products industry, Defendants' improper use of the METAGENICS® Mark in connection with their business will likely cause the public, including Plaintiff's current and prospective customers, to mistakenly

believe that Defendants' products are sponsored by, affiliated with or associated with, or otherwise connected to Plaintiff.

72.     Defendants' unauthorized use in commerce of the METAGENICS® Mark has enabled Defendants to earn substantial profits to which it is not in equity or good conscience entitled and has unjustly enriched Defendants at Plaintiff's expense, all to Defendants' profit and Plaintiff's damage.

73.     Defendants' aforesaid conduct has caused and will continue to cause irreparable injury to Plaintiff and to the good will associated with Plaintiff's trademark. Plaintiff has no adequate remedy at law and will continue to be irreparably injured unless and until Defendant's conduct is permanently enjoined by this Court.

## COUNT II
## USE OF FALSE DESIGNATIONS OF
## ORIGIN AND FALSE DESCRIPTIONS

74.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

75.     Defendants' use in commerce of Plaintiff's unique and distinctive mark in connection with Defendants' Xymogen brand of nutritional products is likely to cause the public to believe that Defendant's products originate from or are sponsored by Plaintiff or are offered under Plaintiff's supervision or control.  As a result of the wide public acceptance of Plaintiff's METAGENICS® Mark, Defendant's use of the same or highly similar mark in connection with its nutritional products will likely cause consumers to mistakenly believe that Defendant's goods are sponsored by, affiliated or associated with, or otherwise connected to Plaintiff.

76.     As a result of the widespread public acceptance of Plaintiff's METAGENICS® Mark in connection with the nutritional products industry, Defendants' improper use of the METAGENICS® Mark in connection with their business will likely cause the public, including Plaintiff's current and prospective customers, to mistakenly believe that Defendants' products are sponsored by, affiliated with or associated with, or otherwise connected to Plaintiff.

77.     Defendants, therefore, have promoted the sale of its products in connection with its use of the infringing METAGENICS® Mark of Plaintiff in interstate commerce so as to cause confusion or mistake among the public as to the true origin, source, sponsorship, approval, authorization, association or affiliation of Defendants products, all to Defendants' profit and Plaintiff's damage.

78.     As a result of the foregoing acts of Defendants, Plaintiff has suffered damages and Defendants have acquired profits at Plaintiff's expense.

79.     The acts of Defendants complained of above are likely to deceive and cause confusion of the public and constitute use of false designations of origin and false descriptions and false representations in commerce all in violation of Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a), for which Plaintiff has no adequate remedy at law. Plaintiff will continue to be irreparably injured unless and until this Court permanently enjoins Defendants' conduct.

## COUNT III
## COMMON LAW UNFAIR COMPETITION

80.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

81.    Defendant has used and continues to use the METAGENICS® Mark with the calculated purpose of passing off its goods as those of Metagenics, of trading upon Metagenics' significant good will and reputation symbolized by the METAGENICS® Mark, and to deceive and mislead the public as to the true nature, characteristics and origin of Defendants' products, all to Defendants' profit and Plaintiff's damage.

82.    Defendants' acts constitute unfair competition under the common law of the State of Florida and have caused, and unless restrained by this Court, will continue to cause, immediate and irreparable injury to Metagenics' good will and reputation for which it has no adequate remedy at law.

## COUNT IV
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

83.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

84.    Defendants' improper use of the METAGENICS® Mark in connection with the nutritional products business constitutes deceptive and unfair trade practices under Florida Statutes § 501.201 *et seq.*, in that the Defendants have represented that its goods and products have qualities, characteristics, sponsorship, and/or approval that they do not have, and in that Defendant has disparaged the goods, products, services or business of Metagenics by false or misleading representations of fact.

85.    The public is likely to be substantially damaged as a result of Defendants' deceptive and unfair trade practices.

86.   Unless permanently enjoined by this Court, Defendants will continue said deceptive and unfair trade practices, thereby deceiving the public and causing Metagenics immediate and irreparable injury for which it has no adequate remedy at law.

## COUNT V
### STATUTORY INJURY TO BUSINESS REPUTATION

87.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

88.   Metagenics, by virtue of its prior adoption and use in interstate commerce of the METAGENICS® Mark in connection with the nutritional products business in this District and elsewhere, has acquired, established, and owns valuable rights in the said trademark.

89.   Defendants' past and continued use of the infringing METAGENICS® Mark in connection with the Xymogen brand of nutritional products constitutes copying and imitation of Plaintiff's METAGENICS® Mark, falsely designates the origin of Defendants' products, has caused confusion, mistake and deception and is likely to cause further confusion, mistake or deception, and therefore is likely to injure the business reputation of Metagenics in violation of Florida Statutes § 494.151.

90.   Unless permanently enjoined by this Court, Defendants' continued advertising, offering for sale, selling, marketing and promoting of Defendants' products in connection with the METAGENICS® Mark will continue to result in the likelihood of further confusion, mistake and deception by the public concerning the source or origin of the goods manufactured and offered for sale and sold by Defendants and produce the

attendant irreparable injury and damage to Plaintiff and its good will and business reputation, for which Plaintiff has no adequate remedy at law.

## COUNT VI
## COMMON LAW TRADEMARK INFRINGEMENT

91.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

92.    Metagenics, by virtue of its prior adoption and use in interstate commerce of the METAGENICS® Mark in connection with the nutritional products industry in this District and elsewhere, has acquired, established, and owns valuable common law rights in the said trademark.

93.    Defendants' past and continued use of the infringing METAGENICS® Mark in connection with the dietary and nutritional supplements industry constitutes copying and imitation of Plaintiff's METAGENICS® Mark, falsely designates the origin of Defendants' products, has caused confusion, mistake and deception and is likely to cause further confusion, mistake or deception, and therefore infringes Metagenics' common law rights in the METAGENICS® Mark in violation of the common law of the State of Florida.

94.    Unless permanently enjoined by this Court, Defendants' continued advertising, offering for sale, and promoting of Defendants' products in connection with the METAGENICS® Mark will continue to result in the likelihood of further confusion, mistake and deception by the public concerning the source or origin of the goods manufactured and offered for sale and sold by Defendants and produce attendant

irreparable injury and damage to Plaintiff and its good will and business reputation, for which Plaintiff has no adequate remedy at law.

## COUNT VII
## COMMON LAW UNJUST ENRICHMNT

95.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

96.    Defendants' use of the infringing METAGENICS® Mark in connection with the advertising, promoting and sale of its nutritional products, from which Defendants have derived substantial profits, have unjustly enriched Defendants by enabling it to unfairly appropriate the benefit of Metagenics' extensive use and promotion of the METAGENICS® Mark in connection with its products and the goodwill associated therewith.

97.    By reason of the foregoing, Defendants has unjustly enriched itself in an unknown amount, and Plaintiff is entitled to just compensation under the common law of the State of Florida.

98.    Defendants' are continuing to earn revenues and profits to which it is not legally entitled, causing irreparable injury to Metagenics by the aforesaid acts of Defendants for which Metagenics has no adequate remedy at law.

## COUNT VIII
## MISAPPROPRIATION AND CONVERSION

99.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

100. Defendants, through the unauthorized use of the infringing METAGENICS® Mark in connection with nutritional products, have misappropriated Plaintiff's rights and good will associated with its use of the METAGENICS® Mark in connection with its nutritional products, and Defendants have converted to its own use and exploited Metagenics' service marks, thereby reaping for Defendants' benefit the benefits of Metagenics' long years of use, promotion of and the good will symbolized thereby, of the METAGENICS® Mark owned by Plaintiff.

## COUNT IX
### TORTIOUS INTERFERENCE

101. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

102. Plaintiff has existing, established and long standing business relationships with its designated authorized distributors for the purpose of effectively and safely distributing the METAGENICS® products to health care professionals and customers throughout the United States.

103. Plaintiff has existing, established and long standing business relationships with specific health care professionals and other long time customers of the nutritional products sold under the METAGENICS® Mark.

104. Defendants knew that Plaintiff's above referenced business relationships existed and Defendants are fully aware of such business relationships.

105.    Defendants intentionally committed acts designed to interfere with and disrupt the business relationships between Plaintiff and the designated authorized distributors.

106.    Defendants intentionally committed acts designed to interfere with and disrupt the business relationships between Plaintiff and the specific long time customers and health care professionals.

107.    Defendants intentionally and improperly interfered with such business relationships by improperly inducing certain authorized distributors to breach their agreement with Plaintiff and to provide Defendants with METAGENICS® nutritional supplement products.

108.    Defendants intentionally and improperly interfered with Plaintiff's business relationships with long time customers and health care professionals by attempting to induce such customers not to continue doing business with Plaintiff and to steal such customers through "bait and switch" tactics and other unlawful methods of competition.

109.    Defendants' acts caused disruption and interference with Plaintiff's business relationships.

110.    Defendants' methods of interference are improper.  Defendants' motives for interference are improper.

111.    Plaintiff has suffered damages as a direct result of Defendants' wrongful and intentional interference.

## COUNT X
## FALSE ADVERTISING

112.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67 as though fully set forth herein.

113.   Defendants' false and deceptive advertising has, upon information and belief, actually deceived or has the tendency to deceive a substantial portion of nutritional supplement purchasers into believing that Defendants' products are affiliated with or originate from Metagenics and the METAGENICS® Mark.

114.   Defendants' advertising and promotional materials contain information about Metagenics and the products bearing the METAGENICS® Mark that is false, misleading and factually incorrect.

115.   Defendants' deceptive advertising materially influences the purchasing decisions of nutritional supplement purchasers, including health care professionals and ultimate consumers, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

116.   Plaintiff has been injured as a result of Defendants' deceptive and false advertising in that it has suffered a loss of sales and a loss of goodwill directly as a result of Defendants' deceptive and false advertising, for which Plaintiff has no adequate remedy at law.  Plaintiff will continue to be irreparably injured unless and until this Court enjoins Defendants' misconduct.

## JURY DEMAND

117.   Plaintiff demands a trial by jury of all issues raised in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the unlawful misconduct of Defendants alleged in Counts I through X above, Plaintiff prays that the Court enter judgment that:

A.     Plaintiff's rights in and to, and its Federal registrations for the METAGENICS® Marks, are valid, enforceable and subsisting in law; that its METAGENICS® Marks has acquired distinctiveness among the consuming public based on Plaintiff's substantial investment of time and money in developing and promoting the METAGENICS® Mark in connection with nutritional products industry and is now a "Famous" mark; and the consuming public's recognition of the METAGENICS® Mark in connection with nutritional products functions as a source identifier for such products and that such mark is owned by Plaintiff;

B.     Defendants have infringed Plaintiff's federally registered trademarks for METAGENICS®, U.S. Trademark Registration Nos. 1,746,757 and 2,148,578, in violation of 15 U.S.C. § 1114(1), and that such infringement has been willful pursuant to 15 U.S.C. § 1117;

C.     Defendants have used false designations of origin, false descriptions, and false representations in violation of 15 U.S.C. § 1125(a);

D.     Defendants have infringed Metagenics' rights in the METAGENICS® Mark in violation of federal and state common law principles of trademark infringement and unfair competition;

E.     Defendants have engaged in deceptive and unfair trade practices in violation of Florida Statutes § 495.011 *et seq.* and Florida Statutes § 501.201 *et seq.*;

F.   Defendants have been unjustly enriched in violation of Florida common law as well as has misappropriated and improperly converted to itself revenues and property related to Plaintiff's METAGENICS® Mark in violation of Florida common law;

G.   Defendants, its divisions, related companies, officers, agents, servants, employees, attorneys and all persons acting in concert or participation with them who receive actual notice of the order, be permanently enjoined from:

(1)   using Plaintiff's METAGENICS® trademark, in any form or in any manner, in connection with Defendants' nutritional products business or any mark which is confusingly similar to Plaintiff's METAGENICS® Mark, in any form or in any manner;

(2)   committing any acts calculated to cause the public to believe that Defendants and/or any of Defendants' products are associated with, affiliated with or sponsored by Plaintiff or are authorized by Plaintiff, in whole or in part;

(3)   otherwise competing unfairly with Plaintiff in any manner, including without limitation, using a false designation of origin, false description or false representations which misrepresent the nature, characteristics or qualities, source or origin of Defendants' products; and

(4)   attempting, causing, or assisting. others with any of the above-described acts;

H.     Pursuant to Section 36 of the Trademark Act of 1946, 15 U.S.C. § 1118, order Defendants and all related companies, divisions, officers, directors, agents, servants, employees, and those persons in active concert or participation with them, to deliver to Metagenics for destruction all goods, advertising and promotional materials related to the goods, signs, displays, stationery, and all other materials of any kind or nature bearing the infringing METAGENICS® Mark, as well as all plates, molds, matrices and other means for making or duplicating the same;

I.     Defendants be required to account to Plaintiff for any and all profits, gains and advantage derived by, and all damages sustained by Plaintiff, by reason of Defendants' acts complained of herein and that such damages and profits be trebled and awarded to Plaintiff pursuant to 15 U.S.C. § 1117 on the ground that Defendants' misconduct has been willful, deliberate and in bad faith;

J.     Plaintiff recover punitive damages in an amount to be determined at trial for violation of Florida common law of misappropriation, conversion, trademark infringement and unfair competition;

K.     Plaintiff recover pre-judgment interest on the amount awarded and post-judgment interest until paid, to the maximum extent allowed by law;

L.     Because Defendants have deliberately and in bad faith misappropriated Plaintiff's METAGENICS® Mark in connection with nutritional supplement products, Defendants have unfairly competed with Plaintiff and that Plaintiff be awarded its costs, attorneys' fees and expenses in this suit under 15 U.S.C. § 1117; and

M.    Plaintiff be awarded such other and further relief, at law or in equity, as the Court may deem just and proper.

Respectfully submitted this 20th day of October, 2004.

**McDermott Will & Emery LLP**

Steven E. Siff (FBN: 352330)
*ssiff@mwe.com*
Michael G. Austin (FBN: 0457205)
*maustin@mwe.com*
201 South Biscayne Boulevard, 22nd Floor
Miami, Florida  33131-4336
Telephone:    305-358-3500
Facsimile:    305-347-6500

*Attorneys for Plaintiff Metagenics, Inc.*

## VERIFICATION

I, Jeffrey J. Katke, hereby state that I am the Chief Executive Officer of Plaintiff Metagenics, Inc. All statements made in this Verified Complaint concerning Plaintiff and Plaintiff's activities are based on my personal knowledge, based on information made available to me in connection with my position, and/or based on corporate documents readily available to me, and all statements concerning Defendants' activities are true based on my personal knowledge and/or made upon information and belief and are believed to be true.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October **19**, 2004

_____

Jeffrey J. Katke